IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   **Plaintiff,**<br><br>vs.<br><br>ADAM ROBERT CHARTIER,<br><br>   **Defendant.** | No. CR13-0018<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

*I.*   *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*   *ISSUES PRESENTED* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*IV.*   *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*V.*   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     *A.*   *Was the Traffic Stop Lawful?* . . . . . . . . . . . . . . . . . . . . . . . . 6
     *B.*   *Was the Traffic Stop Unduly Prolonged?* . . . . . . . . . . . . . . . . . 9
     *C.*   *Was the Pat-Down Search of Defendant Lawful?* . . . . . . . . . . . . 12
     *D.*   *Was the Search of Defendant After the Canine Alert Lawful?* . . . . 14
     *E.*   *Should the Court Suppress Defendant's Statements?* . . . . . . . . . . 17

*VI.*   *SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VII.*   *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I. INTRODUCTION

On the 1st day of August 2013, this matter came on for hearing on the Motion to Suppress (docket number 25) filed by the Defendant on July 17, 2013. The Government was represented by Assistant United States Attorney Lisa Williams. Defendant Adam Chartier appeared in person and was represented by his attorney, Chad Frese.

## II. PROCEDURAL HISTORY

On April 15, 2013, Defendant Adam Chartier was charged by Indictment with one count of possession of pseudoephedrine to manufacture methamphetamine and one count of attempted manufacture of methamphetamine. At the arraignment on April 17, 2013, Defendant entered a plea of not guilty and trial was set for June 17, 2013. On Defendant's motion, the trial was subsequently continued to July 15, 2013.

On June 26, 2013, a superseding indictment was filed. The superseding indictment is identical to the original indictment, except the date of the offense in Count 1 was changed from March 26, 2013 to December 7, 2012. On Defendant's motion, the trial was continued to August 26, 2013.

On July 17, 2013, Defendant timely filed the instant motion to suppress. The Government filed its resistance on July 29, 2013. On Defendant's motion, the trial was continued to October 21, 2013.

## III. ISSUES PRESENTED

Defendant raises five issues in his Motion to Suppress: First, was the traffic stop lawful; second, was the traffic stop unduly prolonged; third, was the pat-down search of Defendant lawful; fourth, was the search of Defendant following the canine alert lawful; and fifth, should Defendant's statements be suppressed.

## IV. RELEVANT FACTS

Shortly after 11:00 p.m. on December 7, 2012, Officer Erik Naaktgeboren of the Hiawatha Police Department was on routine patrol, traveling north bound on North Center

Point Road. Naaktgeboren has been a police officer for nine years and is in charge of the Hiawatha Police Department K-9 unit. Naaktgeboren has received special narcotics-related training, and is a certified clandestine methamphetamine laboratory technician. He is also a certified canine handler with a narcotic detection dog, Reso, who accompanies him on every shift.

Officer Naaktgeboren observed a blue Mercury Grand Marquis traveling north on North Center Point Road around 11:00 p.m. on December 7, 2012. As a routine measure, Naaktgeboren entered the license plate number into the mobile computer in his car. The records came back that the registered owner of the Grand Marquis was suspended from driving and did not have SR-22 insurance on file, which typically indicates the car may not be registered with the state. Naaktgeboren testified that because it was dark and misty, he was unable to determine whether the description of the registered owner — a white male — matched the driver of the vehicle. Naaktgeboren could see through the back window that there were two heads above the seat rests, but he could not pull next to the car to further investigate the identity of the driver because the vehicles were traveling on a road with only one lane of traffic in each direction. Naaktgeboren initiated a traffic stop to determine whether the driver of the vehicle was the registered owner, who is not valid to drive, and to check on the vehicle's registration.

Upon approaching the vehicle, Officer Naaktgeboren observed that the driver of the vehicle was female and thus could not be the registered owner. He informed the driver that he stopped the vehicle because the registered owner is a suspended driver and does not have insurance on file. While speaking with the driver, Naaktgeboren noticed a jug of muriatic acid in the backseat area and a package of airline tubing in a plastic Wal-Mart bag tucked under Defendant's leg in the passenger seat. Naaktgeboren testified that he noticed the items immediately when he approached the vehicle to talk to the driver. Based on his

3

training and experience as a clandestine lab technician, Naaktgeboren recognized the gas and tubing as items regularly used to manufacture methamphetamine.

Officer Naaktgeboren asked for identification from the driver and Defendant. From their driver's licenses, he identified the driver as Aubrey Sivola and the passenger as Defendant Adam Chartier. He returned to his patrol car to check both individuals for outstanding warrants. Naaktgeboren testified that when he saw Defendant's name on the driver's license, he recognized Defendant as someone known to be involved in methamphetamine activity. Naaktgeboren had heard about Defendant from local DEA task force and narcotics officers, and Defendant's name had been mentioned to him during the course of processing meth labs. After Naaktgeboren called in the licenses, dispatch notified Naaktgeboren that Sivola was valid to drive and that the vehicle did not have insurance on file. Regarding Defendant, Naaktgeboren testified dispatch advised that Defendant had a history of assault with a weapon in the records.

After another officer arrived on the scene, Officer Naaktgeboren again approached the vehicle. He had Sivola exit the car, and asked her where she and Defendant were coming from. Sivola responded that she and Defendant were returning from Wal-Mart. Naaktgeboren asked if they had bought anything, and she said that they had not. Naaktgeboren testified that he found the response suspicious because he had seen the tubing in the Wal-Mart shopping bag in the vehicle. Naaktgeboren then asked Sivola about the muriatic acid and tubing he had observed, and whether there was a meth lab in the vehicle. She responded that there was not. He asked Sivola to empty her pockets and informed her that he would be walking his canine partner around the car.

Officer Naaktgeboren then had Defendant exit the vehicle and explained that he was going to walk the narcotics dog around the car. Naaktgeboren testified that when Defendant stepped out of the vehicle, he observed bulges in Defendant's coat. Naaktgeboren asked Defendant where he and Sivola were coming from, and Defendant

4

stated that they had gone to Wal-Mart, where he had bought plastic tubing for air brushing. Naaktgeboren asked if Defendant had anything illegal on him, and requested consent to perform a pat-down or a search. Defendant refused consent, but Naaktgeboren informed him that he was going to perform a pat-down anyway for safety reasons. Naaktgeboren testified that given the bulges in Defendant's coat, Defendant's prior assault with a weapon charge, and his possible connection to narcotics, Naaktgeboren was concerned that Defendant may have a weapon. As Naaktgeboren began the pat-down, he asked Defendant what the round item in his coat was. Defendant responded that it was a package of hypodermic needles, and pulled the needles out of his pocket. Naaktgeboren had Defendant set the needles on the trunk of the vehicle, and he did not take any other items from Defendant at that time.

Following the pat-down of Defendant, Officer Naaktgeboren walked his canine partner, Reso, around the vehicle. Reso is trained and certified to detect the odor of marijuana, cocaine, methamphetamine, and heroin. Reso is a passive alerting narcotics dog, which means that when he detects the odor of narcotics he will go as close to the source of the smell as possible, then alert by sitting down. Naaktgeboren started the canine sniff on the driver's side of the vehicle, walked around back of the vehicle, then up to the passenger side. When Reso reached the passenger side of the vehicle, he alerted near the front passenger side door by sitting down.

After the canine alert, Officer Naaktgeboren searched the vehicle. He seized the bottle of muriatic acid and tubing, but did not find any controlled substances. Naaktgeboren then instructed Defendant to step to the front of the patrol vehicle, and instructed him to place his hands on the hood. Naaktgeboren informed Defendant that he was going to search him, and Defendant denied consent. Naaktgeboren told Defendant that he was going to search him anyway, and that Defendant must cooperate or he would be arrested. Naaktgeboren then asked Defendant if he had anything that will stick, stab,

5

or poke him. Naaktgeboren testified that he was concerned, especially given the fact that he had already found a package of needles on Defendant, that he might get stuck by a sharp object while searching Defendant. He then asked Defendant if he had any controlled substances and, according to Naaktgeboren, Defendant replied "you know what I have." Naaktgeboren then asked if Defendant had methamphetamine, and Defendant admitted that he did. Naaktgeboren seized three small plastic bags containing methamphetamine from Defendant's pants pockets, a drill bit case containing 10 grams of pseudoephedrine pills from his jacket, and a pipe from his jacket pocket.

Officer Naaktgeboren then placed Defendant in handcuffs and read him his *Miranda* warnings. After Naaktgeboren had read Defendant his rights, Defendant volunteered that he is a methamphetamine user and trades pseudoephedrine pills for methamphetamine. While transporting Naaktgeboren to jail, Defendant also volunteered other information about his past involvement with methamphetamine.

## V. DISCUSSION

### A. Was the Traffic Stop Lawful?

Because a traffic stop constitutes a seizure within the meaning of the Fourth Amendment, a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity is occurring. *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (internal citations omitted). Defendant concedes that "if Officer Naaktgeboren had a reasonable and articulable suspicion that the driver of the vehicle did not have a valid driver's license, he was entitled to stop the vehicle and briefly detain the driver to investigate the status of his or her driver's license."[1]

Reasonable suspicion is a less demanding standard than probable cause, but the justification for a stop must be more than an "inchoate and unparticularized suspicion or

---

[1] Defendant's Brief (docket number 25) at 2.

'hunch'" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Rather, reasonable suspicion requires the officer to have a "particularized and objective basis" for suspecting criminal activity. *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007). Courts assess reasonable suspicion from the point of view of the officer based on the totality of the circumstances known to the officer at the time. *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). In regard to traffic stops, where an officer has an articulable and reasonable suspicion that a driver is unlicenced or that a vehicle is unregistered, stopping the vehicle to check the driver's license and the vehicle registration does not violate the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). When assessing the constitutionality of a traffic stop, the subjective motivations or intentions of the officer are irrelevant. *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007).

Here, although Defendant concedes that a reasonable suspicion that the driver does not have a valid driver's license justifies a traffic stop, Defendant questions whether Officer Naaktgeboren's suspicion of criminal activity was reasonable and articulable. Defendant argues that the traffic stop at issue "can very credibly be argued as pretextual," and that as a K-9 trainer, Naaktgeboren "look[s] to seize drugs."[2] Defendant also argues that Naaktgeboren should have made efforts to investigate the identity of the driver before initiating a traffic stop.

I believe the traffic stop at issue was supported by a reasonable, articulable suspicion that the driver was unlicensed. Officer Naaktgeboren's suspicion that the driver lacked a valid driver's license was not based on an "unparticularized suspicion or hunch." *See Terry*, 392 U.S. at 27. Rather, Naaktgeboren had a particularized and objective basis for suspecting that the driver was unlicensed because he had learned that the registered

---

[2] Defendant's Brief (docket number 25) at 2.

owner was a suspended driver. Although Naaktgeboren was ultimately mistaken in believing that the driver lacked a license, in that Sivola was a valid driver, the stop was nevertheless legal because it was supported by reasonable suspicion. *See United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (noting that the determinative question is not whether a driver actually violated the Motor Vehicle Code, but whether an objectively reasonable officer could have formed a reasonable suspicion that the driver committed a code violation). While Defendant suggests that the stop was pretextual, and that Naaktgeboren was hoping to discover drugs, Naaktgeboren's subjective motivations for stopping the vehicle are irrelevant when assessing the legality of the stop. *See Herrera-Gonzalez*, 474 F.3d at 1109; *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999) ("A valid traffic stop may not be challenged on the ground that it was a pretext for other investigation.").

Although Defendant argues that Officer Naaktgeboren should have further investigated the identity of the driver before stopping the vehicle, Naaktgeboren testified that the darkness and weather conditions prevented him from observing anything about the driver. The video of the traffic stop supports Naaktgeboren's testimony that all he could see through the vehicle's back window was that there were two occupants.[3] While Defendant suggests that Naaktgeboren should have pulled up next to the vehicle, Naaktgeboren testified that he could not safely do so because the cars were traveling on a road with only one lane of traffic in each direction. Further, Defendant does not cite any authority that requires an officer to take such measures to identify the driver before initiating a traffic stop based on a reasonable suspicion that the driver lacks a license. Accordingly, because the traffic stop was supported by a reasonable, articulable suspicion

---

[3] *See* Government's Exhibit 1A.

that the driver lacked a valid driver's license, the Court finds that the traffic stop was lawful.

## B. Was the Traffic Stop Unduly Prolonged?

Defendant argues that Officer Naaktgeboren should have ended the traffic stop once he realized that Sivola could not be the registered owner of the vehicle. The Eighth Circuit Court of Appeals has stated that "a lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete' the mission of the stop." *United States v. Hernandez-Mendoza*, 600 F.3d 971, 975 (8th Cir. 2010) (quoting *Illinois v. Cabelles*, 543 U.S. 405, 407 (2005)). However, once an officer makes a valid traffic stop, the officer

"may lawfully check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car." *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003). *See also $404,905.00 in U.S. Currency*, 182 F.3d at 657 (noting that an officer can detain the driver after making a valid traffic stop while the officer completes routine tasks such as computerized checks of the driver's license, criminal history, and vehicle registration). The officer may also "question a vehicle's passengers to verify information provided by the driver." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (citations omitted).

Here, once Officer Naaktgeboren made a lawful traffic stop, he was allowed to perform routine procedures like checking Sivola's driver's license and the vehicle registration. While Defendant argues that the interaction should have immediately ceased upon Naaktgeboren realizing that Sivola was not the registered owner of the vehicle, once Naaktgeboren made a valid stop he was authorized to carry out the normal procedures incident to conducting a traffic stop. *Brown*, 345 F.3d at 578. Further, even though Naaktgeboren immediately observed that Sivola was not the vehicle's registered owner,

the purpose of the traffic stop was not complete because his concern about the vehicle's lack of insurance on file remained.

Furthermore, even if the original purpose of the stop was complete when Officer Naaktgeboren observed that Sivola was not the registered owner of the vehicle, an officer can expand the scope of the traffic stop and ask questions unconnected to the original traffic offense if the officer's suspicions are aroused in the course of the stop. *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999). That is, "if the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address this suspicion." *United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008); *See also United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (noting that further detention after the purpose of a traffic stop is complete is unreasonable, unless something occurred to create reasonable suspicion to justify further detention). In assessing whether the officer had reasonable suspicion to expand the scope of the stop, courts consider "the totality of the circumstances, in light of the officer's experience." *Sanchez*, 417 F.3d at 975 (citation omitted).

Here, Officer Naaktgeboren's observation of muriatic gas and airline tubing immediately upon approaching the vehicle established reasonable suspicion to justify further detention. That is, even if the purpose of the stop was complete when Naaktgeboren determined that Sivola was not the registered owner of the vehicle, reasonable suspicion of other criminal activity justified further detention. Because of his experience as a clandestine methamphetamine lab technician, Naaktgeboren recognized the gas and tubing in the vehicle as consistent with the manufacture of methamphetamine. Naaktgeboren was allowed to expand the scope of the stop to address his reasonable suspicion that the vehicle's occupants were involved in manufacturing methamphetamine. Accordingly, although Naaktgeboren had immediately observed that Sivola was not the registered owner, his reasonable suspicion of other criminal activity justified further

detention so that he could carry out routine procedures like asking for identification, checking on the vehicle's registration, and inquiring about the occupants' trip.

Officer Naaktgeboren was also allowed to walk his drug detection dog around the car. A canine sniff of the exterior of a car is not a "search" within the meaning of the Fourth Amendment. *$404, 905.00 in U.S. Currency*, 182 F.3d at 649. The Eighth Circuit Court of Appeals has characterized a canine sniff that occurs shortly after a traffic stop as a "*de minimis* intrusion . . . like routinely ordering a lawfully stopped motorist out of the vehicle to protect officer safety." *Id.* Accordingly, "when a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure, it does not violate the Fourth Amendment to require that the offending motorist's detention be momentarily extended for a canine sniff of the vehicle's exterior." *Id.* Even if the purpose of the traffic stop is complete, a dog sniff that occurs within a short period of time is a *de minimis* intrusion that does not violate the Fourth Amendment. *United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010).

For example, in *Mohamed*, the Court held that a police officer did not unreasonably prolong a traffic stop by conducting a canine sniff within five minutes of concluding a traffic stop. *Id.* The Court noted that the officer's observations during the traffic stop had led to a reasonable suspicion that there were drugs in the vehicle. *Id.* In explaining why the canine sniff was lawful as a *de minimis* intrusion, the Court stated that "while reasonable suspicion is not required for a canine search to be considered a de minimis intrusion . . . it is worth nothing that such reasonable suspicion existed in this case." *Id.* Accordingly, the Court held the sniff lawful because it "did not unreasonably prolong the stop, and was based on reasonable suspicion anyway to believe that there might be drugs in [the defendant's] car." *Id.* at 1006.

Here, the narcotics dog was already at the scene of the stop in the back of the patrol car, and Defendant does not argue that the stop was unduly prolonged as a result of the

canine sniff. Because a canine sniff is a *de minimis* intrusion rather than a search, Officer Naaktgeboren was allowed to briefly extend the traffic stop by walking the dog around the vehicle. Even if the purpose of the stop was complete, the canine sniff occurred within a short period of time and was a *de minimis* intrusion that did not violate the Fourth Amendment. Further, as in *Mohamed*, where the Court noted that the canine sniff was also supported by reasonable suspicion the vehicle contained drugs, the canine sniff here was supported by a reasonable suspicion that there could be methamphetamine or a methamphetamine lab in the vehicle. Accordingly, I believe the traffic stop was not unduly prolonged by Naaktgeboren carrying out routine procedures incident to a stop such as asking for identification and checking vehicle registration, or by conducting a canine sniff.

### C. Was the Pat-Down Search of Defendant Lawful?

Defendant argues that "the search of Chartier personally was a violation of his 4th Amendment right against unreasonable searches and seizures." Defendant asserts Officer Naaktgeboren "did not articulate with any specificity any threat to his safety by Chartier."[4]

An officer conducting a traffic stop may order both the driver and the passengers to exit the vehicle. *United States v. Oliver*, 550 F.3d 734, 737 (8th Cir. 2008). The officer may also pat-down the driver and passengers if the officer has reasonable suspicion that they could be armed and dangerous. *Id.* The officer does not have to be certain that a person has a weapon, but rather the officer must only be warranted in believing his safety or that of others is in danger. *Id.* (citing *Terry*, 392 U.S. at 27). When considering whether the totality of the circumstances supports a reasonable suspicion a person is armed, courts "consider a law-enforcement officer's observation of a bulge to be a substantial factor." *United States v. Roggeman*, 279 F.3d 573, 579 (8th Cir. 2002).

---

[4] Defendant's Brief (docket number 25) at 3.

An officer's reasonable belief that a person is involved in the drug trade also supports a reasonable suspicion the person is armed. *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009). In *Binion*, the Court held that the police officer's protective frisk during a traffic stop was justified by a reasonable suspicion the defendant was armed. *Id.* at 1040. The Court stated that the officer's belief that drugs were being transported in the vehicle was one of the circumstances justifying the officer's reasonable suspicion the defendant had a weapon. *Id.* at 1039. In finding the pat-down lawful, the Court reasoned that "an officer's reasonable belief that someone is involved in drug dealing can support a suspicion that the person is armed since weapons are often present incident to the drug business." *Id.* The Court also noted that the law "does not require that an officer have verbalized all the reasons 'justifying the search articulately, only that such reasons be articulable.'" *Id.* at 1040 (quoting *Roggeman*, 279 F.3d at 579).

Here, I believe Officer Naaktgeboren's pat-down of Defendant was supported by reasonable suspicion that he was armed. Naaktgeboren observed bulges in Defendant's coat when he exited the vehicle, which supports a reasonable suspicion Defendant had a weapon. *See Roggeman*, 279 F.3d at 579. Also, as in *Binion* where the Court found the officer's belief the defendant was involved in drug activity supported a reasonable suspicion he was armed, Naaktgeboren's suspicion Defendant was involved in methamphetamine manufacture supports his reasonable suspicion Defendant could have a weapon. Although Defendant notes that "Naaktgeboren did not articulate with any specificity any threat to his safety by Chartier at this time," Defendant does not cite any authority requiring an officer to articulate his reasons for believing a person is armed before performing a pat-down. Naaktgeboren testified that the bulges in Defendant's coat, Defendant's prior assault with a weapons charge, and his connection to narcotics made him concerned Defendant could be armed. I believe the circumstances support a reasonable suspicion Defendant had a weapon, and that the pat-down was lawful.

## D. Was the Search of Defendant After the Canine Alert Lawful?

Defendant asserts that after Officer Naaktgeboren determined Defendant was not armed, there was no probable cause to search Defendant's person notwithstanding the K-9 alert. Defendant argues that "[t]he fact that the K9 indicated on the outside of the automobile near the area where Chartier was seated prior to the search of the automobile does not give rise to probable cause to search his person."[5] The Government contends that "Reso's positive indication in the exact area occupied by defendant, . . . the presence of muriatic gas and tubing in the vehicle, Ms. Sivola's inconsistent statements regarding the purpose of their travel, and the needles found on the defendant during the pat-down" gave probable cause justifying the search of Defendant.[6] The Government also notes that after Naaktgeboren discovered the needles, he "had probable cause to arrest [Defendant] for the charge of possession of drug paraphernalia in violation of Iowa Code Section 124.414," and Naaktgeboren would be authorized to search Defendant incident to the arrest.

Generally, searches conducted without a warrant are "presumptively unreasonable" under the Fourth Amendment. *United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006). However, searches performed incident to a lawful arrest are an exception to the warrant requirement. *New York v. Belton*, 453 U.S. 457 (1981). An officer can make a lawful arrest without a warrant if probable cause exists that the person committed a crime. *Davenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause exists if, at the time of the arrest, the totality of the circumstances known to the officer are "sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense." *United States v. Mendoza*, 421 F.3d 663, 668 (8th Cir. 2005) (citation omitted). When

---

[5] Defendant's Brief (docket number 25) at 3.

[6] Government's Brief (docket number 29) at 10.

14

probable cause to arrest exists, the officer is authorized to perform a search incident to the arrest. *United States v. Oakley*, 153 F.3d 696, 698 (8th Cir. 1998).

A trained narcotics detection dog's positive indication for drugs "is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). In *United States v. Winters*, 600 F.3d 963, 968 (8th Cir. 2010), the Court concluded that a police officer had probable cause to search the defendant's person and vehicle without a warrant. In *Winters*, during a traffic stop, a narcotics dog alerted outside the passenger door of the patrol car where the defendant was sitting. *Id*. at 967. While assessing whether probable cause existed to search the defendant, the Court stated that "an alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of the vehicle." *Id*. The Court concluded that the totality of the circumstances, including the dog alert and the officer's observation that the defendant appeared to be under the influence of narcotics, supported a finding that "the officers had probable cause to conduct the post-sniff search of [the defendant's] person incident to his arrest." *Id*. at 968.

The fact that the officer did not discover narcotics in a vehicle after a canine alert does not mean probable cause no longer exists. *United States v. Anchondo*, 156 F.3d 1043 (10th Cir. 1998). In *Anchondo*, the Court rejected the defendant's argument that officers had no authority the search the defendant's person when the officers did not find narcotics in the defendant's car after a positive canine alert on the vehicle. *Id*. at 1045. The Court stated that "[e]ven if the subsequent fruitless search of the car diminished the probability of contraband being in the car, it increased the chances that whatever the dog had alerted to was on the defendants' bodies." *Id*. Accordingly, the Court concluded that the warrantless search was supported by probable cause, and that "the discovery of cocaine on the defendant's person was the result of a lawful search incident to arrest." *Id*. at 1045-

46. *See also United States v. Freeman*, 2010 WL 5575484 at *6 (C.D. Ill. 2010) (stating that a fruitless search of a vehicle following a canine alert does not invalidate probable cause, but rather it increases the chances that the substance to which the dog alerted will be found on the person of individuals removed from the vehicle).

A search incident to an arrest is lawful even if the search occurred prior to the formal arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). A search is lawful as incident to an arrest when conducted before the formal arrest only if "(1) the arrest and the search are substantially contemporaneous, and (2) probable cause to arrest existed before the search." *United States v. Ilazi*, 730 F.2d 1120, 1126 (8th Cir. 1984).

Here, I believe probable cause existed to justify the search of Defendant incident to his arrest. Reso's positive alert for narcotics established probable cause for the presence of a controlled substance. *See Sundby*, 186 F.3d at 876. Similar to *Winters*, 600 F.3d at 967, where the canine alert outside the passenger door where the defendant was seated contributed to probable cause to search the defendant's person incident to his arrest, Reso's alert on the passenger side where Defendant had been seated contributed to probable cause for Officer Naaktgeboren's arrest and search of Defendant. The fact that Naaktgeboren did not find controlled substances in the vehicle did not diminish probable cause, but rather it increased the chances that the substance Reso alerted to would be found on Defendant. *See Anchondo*, 156 F.3d at 1045. Although Naaktgeboren searched Defendant prior to his formal arrest, the search is still lawful as incident to the arrest because probable cause to arrest existed before the search, and the arrest and search were substantially contemporaneous. *See Ilazi,* 730 F.2d at 1126. The totality of the circumstances, including the canine alert, the discovery of needles on Defendant's person, the inconsistent

stories regarding Defendant's and Sivola's activities, and the presence of gas and tubing in the vehicle, established probable cause that Defendant had committed the crime of possession of drug paraphernalia. Here, the formal arrest followed quickly on the heels of the challenged search because Naaktgeboren placed Defendant under arrest immediately after completing the search.[7] Accordingly, I believe the search of Defendant's person was lawful.

### E. Should the Court Suppress Defendant's Statements?

Police officers must give *Miranda* warnings before interrogating a person in their custody. *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). Failing to administer *Miranda* warnings before a custodial interrogation "results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

In arguing that Defendant's Fifth Amendment rights were violated, Defendant asks the Court to focus "on the admissions made by Chartier when he was searched by Officer Naaktgeboren after being told failure to cooperate would result in charges being filed."[8] The Government concedes that "after Reso positively indicated on the vehicle, defendant was in custody."[9] The Government also concedes that Naaktgeboren's questions about whether Defendant had any controlled substances on him constituted an interrogation. However, the Government asserts that Defendant's statements are admissible because the public safety exception applies.

---

[7] *See* Government's Exhibit 1A.

[8] Defendant's Brief (docket number 25) at 4.

[9] Government's Brief (docket number 29) at 12.

Under the public safety exception to the general rule requiring *Miranda* warnings before interrogations, "a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if *Miranda* warnings had not yet been given." *United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008). Whether the exception applies does not depend on the officer's subjective motivations. *Id.* Rather, courts use an objective standard and apply the exception when "police officers ask questions reasonably prompted by a concern for the public safety." *Id.* (internal citations omitted). Protection of the public safety includes protection of law enforcement officers. *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008). For example, in *United States v. Luker*, 395 F.3d 830 (8th Cir. 2005), the Court held that the public safety exception applied when officers asked the defendant if there was anything in his car that they should know about before searching it. The Court reasoned that "the officers were aware of [defendant's] history of methamphetamine use and were concerned about needles or substances associated with such use in the car and thus the question concerning the contents of the vehicle was warranted." *Id.* at 833-34.

Here, like the officers in *Luker* who were concerned about needles or dangerous substances associated with methamphetamine, Officer Naaktgeboren had reason to be concerned that Defendant may have potentially harmful items connected to methamphetamine on his person. Naaktgeboren had already found a package of needles on Defendant while performing the pat-down, which supports Naaktgeboren's concern that he could come into contact with more dangerous items. Before beginning the search or administering *Miranda* warnings, Naaktgeboren asked if Defendant had anything that would stick, stab, or poke him, and if Defendant had any controlled substances. Defendant apparently responded, "you know what I have," and then admitted to having methamphetamine when asked. Given Defendant's background, Naaktgeboren's prior

discovery of needles on Defendant's person, and the items associated with methamphetamine manufacture in the vehicle, I believe Naaktgeboren's questions were reasonably prompted by a concern for public safety. Thus, the public safety exception applies to make Defendant's statements admissible.[10]

In regard to statements made by Defendant after Officer Naaktgeboren administered *Miranda* warnings, the admissibility of statements made after *Miranda* warnings turns on "whether [the statements] were knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). Here, Defendant does not argue and there are no indications that he did not understand his rights, or that his statements were involuntary. When an officer gives *Miranda* warnings and the warnings were understood, "an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 2262 (2010). Here, Defendant waived his right to remain silent by making knowing, voluntary statements to Naaktgeboren after receiving *Miranda* warnings. Accordingly, Defendant's statements to Naaktgeboren after being informed of his *Miranda* rights are admissible. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ([G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."). Thus, I believe Defendant's statements should not be suppressed.

## VI. SUMMARY

In summary, I conclude that the traffic stop was lawful because Officer Naaktgeboren had a reasonable, articulable suspicion that the driver of the vehicle lacked

---

[10] I also note, parenthetically, that Officer Naaktgeboren already had probable cause to arrest and search Defendant when the statements were made, and he would have located the methamphetamine, pills, and pipe during the search in any event. That Defendant admitted their existence prior to the search does not add significantly to the evidence at trial.

a license because the registered owner was not valid to drive. While Naaktgeboren immediately observed after stopping the vehicle that the driver was not the registered owner, he was authorized to carry out routine procedures incident to conducting a traffic stop, like checking the driver's license and the vehicle's registration. Even if the original purpose of the stop was complete when Naaktgeboren ascertained that the driver was valid to drive, Naaktgeboren's observation of the muriatic gas and tubing in the vehicle established reasonable suspicion justifying expansion of the scope of the stop. Accordingly, the traffic stop was not unduly prolonged.

After Officer Naaktgeboren had Defendant exit the vehicle, the bulges in Defendant's coat and Naaktgeboren's reasonable belief Defendant was involved with methamphetamine supported Naaktgeboren's reasonable suspicion Defendant may have a weapon. Thus, the pat-down search of Defendant was lawful. Following the canine alert on the passenger side of the vehicle, Naaktgeboren had probable cause to arrest Defendant and perform a search incident to the arrest. The search of Defendant was lawful as incident to an arrest because the totality of the circumstances, including the canine alert, the discovery of needles on Defendant's person, the inconsistent stories, and the presence of items consistent with methamphetamine manufacture, established probable cause for Defendant's arrest before the search occurred. Further, the arrest and search were substantially contemporaneous because the formal arrest occurred immediately after the search.

Finally, I believe Officer Naaktgeboren's questions prior to administering *Miranda* rights and searching Defendant fall within the public safety exception. Naaktgeboren had reason to be concerned that he could come into contact with potentially dangerous items associated with methamphetamine while searching Defendant, and his questions were reasonably prompted by a concern for public safety. In regard to statements made by Defendant after receiving *Miranda* warnings, the Court finds that Defendant waived his

right to remain silent by making knowing, voluntary statements to Naaktgeboren. Accordingly, there was no Constitutional violation of Defendant's Fifth Amendment rights.

## VII.  RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 25) be **DENIED.**

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on August 1, 2013.*

DATED this ___16th___ day of August, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA